IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| J.P.S., as Parent, and Next Friend of D.S., Minor Child; D.S., Individually; M.D., Individually; A.W., Individually<br><br>Plaintiffs,<br><br>v.<br><br>THE STATE OF NEBRASKA, THE YOUTH REHABILITATION AND TREATMENT CENTER AT GENEVA, THE NEBRASKA DEPARTMENT OF HEALTH AND HUMAN SERVICES OF THE STATE OF NEBRASKA, DANNETTE SMITH, CHIEF EXECUTIVE OFFICER OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Individually; TREVOR SPIEGEL, Individually; MARK LaBOUCHARDIERE, Individually; DAN SCARBOROUGH, Individually.<br><br>Defendants. | CASE NO.<br><br>4:21-cv-03315-BCB-SMB<br><br><br>AMENDED COMPLAINT AND REQUEST<br>FOR JURY TRIAL |

COMES NOW D.S. and J.P.S., mother and next friend of D.S., M.D., and A.W., by and through their attorneys Vince Powers and Scout Richters and for their causes of action state as follows:

JURISDICTION AND PARTIES

1.     This is an action for injunctive relief and damages pursuant to 42 U.S.C. §1983 based upon the violation of Plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution, Title II of the

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

2.     Jurisdiction exists pursuant to 28 U.S.C. §1331 and §1343 based on 42 U.S.C. §1983 and questions of federal constitutional law. Jurisdiction also exists under the Declaratory Judgment Act 28 U.S.C. §2201(a) and §2202.

3.     Plaintiffs D.S., M.D., and A.W. are citizens of the United States and of Nebraska and were placed at the YRTC-Geneva at the time of the events giving rise to the present case.

4.     At all times relevant, Plaintiff J.P.S. was the mother, natural guardian, and next friend of D.S., a minor. J.P.S. is a citizen of the United States and Nebraska and a resident of Lincoln, Lancaster County, Nebraska.

5.     Plaintiffs request that, due to their ages at the time of the events and the highly sensitive nature of the allegations contained herein, they be permitted to proceed using the pseudonyms D.S., J.P.S., M.D., and A.W.

6.     Plaintiff D.S. was fifteen years old at the time of the events described herein. She became a state ward in March 2019 and was placed in foster homes and detention centers before being committed to YRTC-Geneva in July 2019.

7.     At all times relevant, D.S. had been diagnosed with Autism, Oppositional Defiant Disorder, Attention Deficit Hyperactive Disorder, and Disruptive Mood Dysregulation, Hypothyroidism, and Adrenal Insufficiency.

8.     D.S.'s above-mentioned diagnoses substantially limited her in one or more major life activities of caring for herself, making medical decisions, thinking, and communicating.

9.     At all times relevant, Defendants, and each of them, because of their respective positions and job duties within the facility knew or should have known that D.S. had the above diagnoses and trauma history. Or else, they acted with deliberate indifference to the conditions of the facilities residents.

10.     Plaintiff M.D. was eighteen years old at the time of the events described herein. She turned nineteen and aged out of the system in late August 2019. M.D. was physically and sexually abused and neglected as a child. She was placed in detention facilities and group homes before being sent to YRTC-Geneva in April 2017 and released in March 2018. M.D. was sent to YRTC-Geneva for the second time in January 2019.

11.     At all times relevant, M.D. had been diagnosed with Conduct Disorder, Cannabis Use Disorder, PTSD, Alcohol Use Disorder, Bipolar, ADHD, and Anxiety Disorder.

12.     Plaintiff M.D.'s above-mentioned diagnoses substantially limited her in one or more major life activities.

13.     At all times relevant, Defendants, and each of them, because of their respective positions and job duties within the facility knew or should have known that D.S. had the above diagnoses and trauma history. Or else, they acted with deliberate indifference to the conditions of the facilities residents.

3

14.    Plaintiff A.W. was sixteen years old at the time of the events described herein. She was placed on juvenile probation in September 2018. She was placed in detention centers and a group home before being committed to YRTC-Geneva in June 2019.

15.    At all times relevant, A.W. had been diagnosed with Conduct Disorder, Alcohol Use Disorder, and Cannabis Use Disorder.

16.    A.W.'s above-mentioned diagnoses substantially limited her in one or more major life activities of caring for herself, making medical decisions, and thinking, and communicating.

17.    At all times relevant, Defendants, and each of them, because of their respective positions and job duties within the facility knew or should have known that D.S. had the above diagnoses and trauma history. Or else, they acted with deliberate indifference to the conditions of the facilities residents.

18.    The Special Report of Investigation ("Report"), that was conducted and published by the Office of the Public Counsel/ Ombudsman and Office of Inspector General of Nebraska Child Welfare revealed that 33/35 girls or 94% of them had documented trauma history; and that ALL 35 of them had been diagnosed with behavior disorders and/ or mental health disorders. The report also reads in part as follows:

> "The failures of leadership related to YRTC-Geneva occurred at multiple levels, on multiple fronts, and in ways that were complexly intertwined, with each compounding the consequences of the next. This reflects a failure by leadership to plan, to problem solve, and to dedicate the resources necessary to provide the legally required care for the youth at YRTC-Geneva. The Failure of

> leadership led to management, staffing and training issues, lack of programming and treatment, and the deterioration of the cottages. Each of these elements is required to effectively meet the mission of YRTC-Geneva and the needs of the girls. As a result of these failures, the youth at YRTC-Geneva experiences varying levels of trauma. It was clear after interviewing all the youth, many of them were exposed to or experienced some sort of traumatization or re-traumatization during their commitment at YRTC-Geneva during the crisis."

19.     At all times relevant, the State of Nebraska did operate state agencies including the Nebraska Department of Health and Human Services and the Youth Rehabilitation and Treatment Center at Geneva ("YRTC" or "YRTC-Geneva").

20.     At all times relevant, the State of Nebraska did own, operate, maintain, manage and was responsible for the YRTC.

21.     At all times relevant, Dannette Smith was the Director of the Department of Health and Human Services. As Director, Defendant Smith was charged with the overall responsibility for the operations and safety of all persons housed at the YRTC including D.S., M.D., and A.W. Smith is sued in her individual capacity.

22.     At all times relevant, Mark LaBouchardiere was the Department of Health and Human Services Facility Director over all DHHS facilities including YRTC-Geneva. LaBouchardiere is sued in his individual capacity.

23.     At all times relevant, Trevor Spiegel was the Administrator of the Office of Juvenile Services. Spiegel is sued in his individual capacity.

24.    At all times relevant, Dan Scarborough was the Facility Administrator at YRTC. Scarborough is sued in his individual capacity.

25.    Defendants, and each of them, subjected D.S., M.D., and A.W. to uninhabitable living conditions, subjected one or more of the plaintiffs to inappropriate solitary confinement, failed to provide adequate mental health care, failed to hire, train, or supervise staff in adequate number, failed to accommodate D.S., M.D., and A.W.'s disabilities in violation of the Americans with Disabilities Act and the Rehabilitation Act, and otherwise denied D.S., M.D., and A.W. the services guaranteed to them under Nebraska state law.

BACKGROUND ON YOUTH REHABILITATION<br>AND TREATMENT CENTERS

26.    Under Neb. Rev. Stat. §43-286, when a juvenile age 14-18 has "exhausted all levels of probation supervision, as well as options for community-based services," Nebraska juvenile courts are entitled to commit them to a State-run youth rehabilitation and treatment center (YRTC). Prior to YRTC-Geneva's closure in August 2019, girls committed to the YRTC would be placed at YRTC-Geneva and boys committed to the YRTC would be placed at YRTC-Kearney.

27.    Once committed, the juvenile becomes a state ward, and the Nebraska Department of Health and Human Services assumes their legal care and custody for the purposes of obtaining health care and treatment services.

28.    Neb. Rev. Stat. §43-407, which was law at the time of the events described herein requires YRTC facilities to address "Behavioral and mental

health conditions and needs; Drug and alcohol addiction; Education and special education; Health and medical needs; Individual, group, and family therapy; and Case management and structured programming aimed at reintegrating youth into their families, communities, and schools" of the youth committed to them.

29.     In June of 2016, the Office of Inspector General of Child Welfare released a report of investigation: DHHS Administration Allowed Conditions At The Youth Rehabilitation and Treatment Center - Geneva To Deteriorate.

30.     In 2017 YRTC-Geneva's full-time Licensed Clinic Psychologist Program Director began training staff on a new behavioral incentive program, also known as "levels", which was developed by the Licensed Clinical Psychologist. This program was created specifically for the program in Geneva. The Clinical Psychologist provided training on the "levels" programs monthly for all staff at YRTC-Geneva.

31.     In April 2018 the Clinical Psychologist and Program Director left the program at YRTC-Geneva which left the Clinical Psychologist for Kearney to fill in at Geneva and fulfill the essential duties at Geneva. He was not able to conduct the same training and quality assurance necessary for the "levels" programs at YRTC-Geneva.

32.     Six months after the departure of the Clinical Psychologist from the Geneva facility, the Facility Operating Officer resigned leaving the Facility Administrator, Defendant Scarborough, to manage the campus with only a

part-time Licensed Clinical Psychologist working from YRTC-Kearney and no Facility Operating Officer.

33.    During 2018, YRTC-Geneva was subject to five calls to the Child Abuse and Neglect Hotline. These are investigated by a worker from the Division of Children and Family Services. All allegations were of physical abuse of a youth by staff members.

34.    In 2019, One of the living pods in LaFlesche cottage was shut down completely due in part to an issue with the sewer system. Other areas in the cottage were also in need of repairs due to sustained damage. Concerns about issues related to staffing, the faltering levels program, and inconsistent school attendance by the girls began to surface.

35.    In February 2019, Defendant Smith began her tenure as CEO of DHHS having ultimate responsibility for the agency.

36.    In February 2019, the administration at the Hastings Regional Center was asked to provide some staff to cover shifts at YRTC-Geneva. The relief staff assigned began to report concerns to the Hastings Regional Center administration. They noted the lack of structure at the facility, the negative impact sparse or nonexistent programming was having on both youth and staff, and serious issues of physical safety for both staff and youth.

37.    In February 2019, two calls alleging abuse and/or neglect were made to the hotline. Neither of the calls were investigated due to the allegations

not meeting the definition of abuse or neglect as set forth by the hotline's policy.

38.    During April 2019, Defendant Smith began conducting huddle calls with YRTC administrators, including Defendant Scarborough and Defendant Spiegel, twice a week. These were expanded to daily calls in May 2019. During June 2019, the check-in calls sometimes occurred three times each day.

39.    Overtime hours of Geneva staff were extremely high and rose each month in April, May, and June of 2019.

40.    On May 6, 2019, then acting Inspector General, Julie Rogers, emailed Defendant Smith to clarify leadership roles within the YRTCs, establish the designated contact person for the OIG, and express concern for the lack of leadership consistency within the YRTC system.

41.    On May 24, 2019, the Licensed Clinical Psychologist and Program Director serving both YRTC-Kearney and YRTC-Geneva, submitted a letter of resignation effective August 2019. Defendant Smith subsequently failed to hire new employees to serve in these positions. Several administrators reported that the loss of these two key management positions had a significantly detrimental effect on YRTC-Geneva.

42.    On May 28, 2019, a youth broke a sprinkler head in the Burroughs cottage. Defendant Scarborough decided that no rooms in the cottage would be taken out of service.

43.    On May 31, 2019, Defendant Spiegel was directed to report to YRTC-Geneva daily and was to manage the day-to-day operations of the facility hand in hand with Defendant Smith.

44.    In late spring of 2019, the Hastings Regional Center administration and staff exchanged emails concerning staff burnout/feeling unsafe at the Geneva facility. Frontline staff from the outside facilities continued reporting issues with the lack of programming for youth and training for relief staff. In an email between Hastings Regional Center administration staff, one noted "I don't want to lose good staff because they don't feel secure in what they are doing...they are being assigned to the most difficult living unit and the Geneva staff hang out in an office.".

45.    On June 11, 2019, another sprinkler head was broken by youth in the East living quarters of Burroughs Cottage and was shut down for six days.

46.    There were eight calls to the hotline during April, May, and June of 2019. Some of these included allegations of physical abuse that the youth was denied lunch and the use of a bathroom by staff, causing her to wet herself. The youth also was reported to be suicidal and was not getting the help she needed.

47.    Another allegation of emotional abuse was reported by a caller that a pair of staff encouraged the youth to call them mom and dad and told her they were going to get her out of the facility and take care of her. The two were

forced to resign under other unrelated issues. It was reported that the youth became suicidal after the pair left.

48.     Allegations of physical neglect were reported that the youth were being mistreated by staff, specifically citing an instance where a youth was alleged to have suffered a seizure while staff stood by and did not assist her.

49.     Surveillance videos from 2019 showed long periods of time where the youth were not engaged in any type of activity and were instead roaming within the cottage with very little to no staff interaction. Staff were observed to have little interaction with the youth, having been seen standing or sitting in the day room or staff office, walking in the halls, or congregating together in groups passively watching the girls.

50.     Plaintiff M.D. was taken off her medication in May of 2019 and was not monitored closely thereafter.

51.     Plaintiff D.S. attempted suicide twice while held at the facility. Her guardian was not notified about one of the incidents until the next day by email. One suicide attempt was drinking chemical cleaning agents that she had access to at the facility.

52.     On August 8, 2019, two incidents of broken fire sprinklers occurred. After the second incident, staff made four youths help clean up debris. These children were forced to take off their shoes despite ankle deep water filled with floating debris. Later that night, all the girls were forced to go back to the cottage and sleep, which was reported to still be in disarray.

II

53.     On August 10, 2019, the girls were still required to sleep in the Sacajawea cottage, which remained in disarray (floorboards were ripped out, the ceiling was not repaired in the living area, the lights were either not working or not on, and the cottage's air conditioning was shut off). Video observed showed that the girls were refusing to go to their sleeping rooms. At least two youths got physically sick, vomiting into a bucket.

Plaintiff M.D. specifically recalls residing in a building in which the ceiling was collapsed, containing visible mold, and insulation falling out of the walls. These conditions persisted; however, residents were still forced to sleep in the building; causing symptoms like nausea, vomiting, difficulty breathing, and other allergy-like responses.

54.     On August 10, 2019, the girls called the hotline while staff watched and  reported that they had to sleep in areas with water damage, that they were hot, and the living area had visible mold growing and smelled bad.

55.     One youth reporter stated "Geneva is supposed to be a rehabilitation center. I've only seen a therapist three times since May 29th"

56.     Another youth reported during an OIG interview that "They only had fans in there. They weren't doing anything else to fix the cottage. We were putting our concerns  out there about sleeping back in that cottage. There was a youth who was pregnant and another youth with asthma. Our eyes would be poufy and red, but it went away when we left the cottage. We were getting frustrated. On Saturday night, they brought us back in the cottage around 8

12

p.m. instead of 9 p.m., in the family room two girls started gagging and throwing up, the carpet was all sticky. We were getting frustrated. They made us sleep there, but we just couldn't be there. We just went on strike. We wouldn't go to our rooms to go to sleep.".

57.     On August 11, 2019, the Office of Juvenile Services Administrator, Defendant Spiegel, was contacted by the hotline about the reports and stated that he had assessed the building and was closing it.

58.     Defendants, and each of them, failed to maintain the YRTC-Geneva in a sanitary and safe condition and D.S., A.W. and M.D. were subjected to these conditions by Defendants and each of them.

59.     On or about August 19, 2019, D.S., A.W. and M.D. were removed from the Geneva facility and sent to YRTC-Kearney because of the conditions set forth above.

60.     Solitary confinement is defined by the National Commission on Correctional Health Care as "the housing of an adult or juvenile with minimal to rare meaningful contact with other individuals." While Defendants call this practice "room confinement", the practice at YRTC-Geneva was solitary confinement: children were isolated from others in a locked room for an indefinite period of time with no meaningful social interaction or environmental stimulation.

61.     Defendants subjected children, including D.S., M.D., and A.W. to hours or days of solitary confinement. Contrary to the YRTC's own written

policies, children, including D.S., M.D., and A.W. were confined for days on end as a means to maintain control of a dilapidated, understaffed facility.

Plaintiff D.S. was held in solitary confinement for a total of 15 days, 5 of those days being consecutive.

Plaintiff M.D. was held in solitary confinement for 3 days. This was punishment for reheating a sandwich.

Plaintiff A.W. was held in solitary confinement on ten or eleven different occasions while at the facility. On at least one occasion, A.W. was held in confinement for six consecutive days

62.     While plaintiff D.S. was in solitary confinement, she did not have access to programming, education services, physical activity or fresh air and had no contact with school personnel. No visits with family were permitted and D.S. did not have access to a phone, radio, television, or reading materials. While she was in confinement, D.S. was prohibited from having any normal human contact.

63.     While plaintiff M.D. was in solitary confinement, she did not have access to programming, education services, physical activity or fresh air and had no contact with school personnel. No visits with family were permitted and M.D. did not have access to a phone, radio, television, or reading materials. While she was in confinement, M.D. was prohibited from having any normal human contact.

64.    While she was in solitary confinement for approximately six days, A.W. did not have access to programming, education services, physical activity or fresh air and had no contact with school personnel. No visits with family were permitted and A.W. had no access to a phone, radio, television, or reading materials. While she was in confinement, A.W. was prohibited from having any normal human contact. Staff would bring A.W. her meals and she would have to bang loudly on her door, sometimes for 30 minutes to one hour, to request that she be taken to use the restroom.

64.    These deprivations of normal social interactions and environmental stimulation imposed on D.S, M.D., and A.W. were exacerbated by the harsh, unsafe, and unsanitary conditions inside the cells. The decrepit conditions of the YRTC-Geneva facility as a whole were magnified when girls, including D.S. and A.W. were locked in a room for hours or days on end. D.S., M.D., and A.W., and were required to sleep on a hard surface, with no mattress or blanket, in a room with no working light fixtures.

65.    Like other children subjected to solitary confinement, D.S., M.D., and A.W. experienced symptoms such as insomnia, depression, hallucinations, agitation, anger, fear, distress, anxiety, sadness, mistrust, and feelings of hopelessness and abandonment. D.S., M.D., and A.W. began to experience these effects almost immediately and they worsened as her time in solitary continued.

66.     Defendants, and each of them, know there is a serious risk of harm for children in solitary confinement, including new and worsening mental illness symptoms, self-harming behaviors, and suicide, but did not, in practice, implement any policies to eliminate this risk of harm. For example, Defendants did nothing to screen or exclude children with mental health diagnoses from solitary confinement, did not provide children placed in solitary confinement with an assessment by a mental health professional, did not provide mental health treatment for children in solitary confinement, did not assess children after they were released from solitary confinement to address any lasting effects, and did not provide any meaningful mental health interventions and de-escalation services in response to obvious signs of suffering and pain.

67.     Although Defendants were aware of plaintiff(s) multiple diagnoses as described herein, they conducted no mental health evaluation of plaintiff(s). before placing her in solitary confinement.

68.     Although Defendants were aware of D.S., M.D., and A.W.'s multiple diagnoses as described herein, they conducted no mental health evaluation of plaintiffs before placing them in solitary confinement.

69.     Children are at a heightened risk of psychological and physical harm from solitary confinement. In adolescents, the brain has not yet fully developed and, as a result, trauma from isolation can cause permanent changes in brain development and create a higher risk children will develop new or worsening psychiatric conditions.

70.    For children with pre-existing mental illness and trauma, the serious psychological harm caused by solitary confinement is even more devastating. The use of solitary confinement on D.S., M.D., and A.W., each of whom Defendants knew had preexisting mental health diagnoses and trauma histories, magnified mental health problems and re-traumatized D.S., M.D. and A.W.

71.    Despite the now well-established knowledge of the harms of solitary confinement on children, Defendants used this dangerous and inhumane method on plaintiff(s) who were entrusted to their care for rehabilitation.

72.    Putting children in solitary confinement poses a risk of serious and long-term risk of harm. The prevailing medical, scientific, professional, and correctional authorities all demonstrate that the practice violates contemporary standards of decency in a civilized society to expose children at the YRTC-Geneva, including plaintiffs to such a risk.

73.    Defendants had no legitimate penological purpose that supported subjecting children including plaintiffs to solitary confinement given the established substantial risk of serious harm and the other available options to address the behavioral needs of children.

74.    Defendants did not use solitary confinement at YRTC-Geneva as a last resort to respond to immediate and serious threats of physical harm by children to themselves or others. Rather, Defendants used solitary confinement

for any or no reason at all, including to maintain control of an understaffed, unsanitary, and unsafe facility that offered its residents no programming or meaningful treatment.

75.     Defendants' use of solitary confinement at YRTC-Geneva substantially departed from accepted professional standards, which significantly limit any use of solitary confinement for youth.

76.     At all times relevant, Defendants, and each of them, were deliberately indifferent to the mental health needs of Plaintiffs D.S., M.D., and A.W.

77.     Defendants, and each of them, failed to properly screen the children housed at YRTC-Geneva for medical conditions including mental health conditions upon their arrival.

78.     Defendants, and each of them, failed to employ a sufficient number of qualified mental health professionals to counsel and treat the children with mental health treatment needs.

79.     Defendants, and each of them, failed to adequately train and supervise staff to respond in appropriate ways to children with mental health issues.

80.     Defendants, and each of them, failed to provide a continuum of mental health services to meet the needs of the children. Children at YRTC-Geneva, including D.S., M.D., and A.W. did not receive any regular

individualized psychiatric treatment, counseling, or psychotherapy and the mental condition of D.S., M.D., and A.W. deteriorated as a result.

81.    Defendants, and each of them, failed to maintain adequate mental health records for the children.

82.    Defendants, and each of them, failed to provide adequate or effective group counseling by trained staff.

83.    Defendants, and each of them, failed to provide adequately for children in emotional crisis.

84.    Defendants, and each of them, failed to coordinate follow-up care with community-based health and mental providers for children upon their release from YRTC.

85.    Defendants' failure to provide mental health services to D.S., M.D., and A.W. resulted in symptomatic behavior giving rise to punishment instead of the treatment that was needed. Punishments and lack of sufficient mental health resulted in long-lasting, substantial harm to said Plaintiffs.

86.    As a result of Defendants' deliberate indifference to the serious mental health needs of D.S., M.D. and A.W., the plaintiffs with mental health needs did not receive adequate treatment and suffered harm in violation of their constitutional rights.

87.    Defendants, and each of them, failed to provide virtually any programming for D.S., M.D., and A.W., which resulted in lengthy periods where the children had nothing to occupy their time. Plaintiffs had a constitutional

right to adequate treatment including, among other things, fresh air, outdoor exercise, adequate behavior management and recreation programs. Generally accepted professional standards require that juvenile justice facilities provide not only education, but also recreation and meaningful activities such as a group and individual therapy, social skills training, and other programming. Defendants, and each of them, failed to provide these things.

88.    As a result of Defendants' failure to provide adequate education services, Plaintiffs were denied their right to education and did not make progress in school in violation of their constitutional rights.

FIRST CAUSE OF ACTION
EIGHTH AND FOURTEENTH AMENDMENTS AS TO INDIVIDUAL
DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES.

89.    Plaintiffs incorporate Paragraphs 1 through 88 as if fully set forth herein.

90.    When Defendants take a child into custody as they did with D.S., M.D., and A.W., they assume a duty under the Eighth and Fourteenth Amendments of the United States Constitution to protect the children, including Plaintiffs from harm and substantial risks of serious harm.

91.    The Eighth Amendment prohibits the imposition of cruel and unusual punishment on convicted and incarcerated juveniles, including by exercising deliberate indifference to substantial risk of serious harm, inhumane conditions and inadequate medical and mental health care.

92.     The above-described conditions of confinement at the YRTC-Geneva and Defendants' policies, practices, acts and omissions have inflicted and continue to inflict grave and inhumane deprivations, injuries and risks to Plaintiffs, all of which violate contemporary standards of decency and are intolerable in today's society. The risk of harm to Plaintiffs as a result of the above-described conditions of confinement and the Defendants' policies, practices, acts, and omissions were obvious and known to Defendants.

93.     Moreover, Defendants were notified of these risks by others and thus actually knew of the risks of harm to Plaintiffs as a result of the above-described conditions of confinement at the YRTC-Geneva facility and Defendants' policies, practices, acts, and omissions.

94.     Despite actual knowledge of the obvious risk of harm to Plaintiffs, the Defendants disregarded these excessive risks to the health and safety of the children until the intervention of duly elected Nebraska state senators and the Office of the Public Counsel/Ombudsman and the Office of Inspector General of Nebraska Child Welfare.

95.     As a result, Defendants have acted with deliberate indifference to the excessive risk of harm to the children as a result of the conditions of confinement at the YRTC-Geneva facility and Defendants' policies, practices and omissions complained of herein, all in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

96.     Defendants have used excessive force in various forms including, but not limited to, solitary confinement in rooms for extended periods of time without regard for the need for protection from self-harm or the need to protect others or property, all **in** violation of the Eighth Amendment.

97.     The 14th Amendment prohibits punishment that is not reasonably related to a legitimate government objective. If a punishment decision by a state actor is a substantial departure from accepted professional judgment, the actor cannot be said to have adequately protected the individual's interests.

98.     As described herein, Defendants use of solitary confinement on Plaintiffs was inherently punitive and well outside the range of acceptable professional practices. Defendants' use of solitary confinement, including confining girls in unsafe, unsanitary rooms without mental health care and without proper monitoring **in** order to maintain control of an understaffed facility was frequently out of alignment with best practices, DHHS policy, and the YRTC-Geneva Operating Memoranda. Such use of solitary confinement is not related to any legitimate government objective.

99.     Plaintiffs are entitled to declaratory judgment and monetary damages of this Court that individual Defendants in their individual capcities, and each of them, have violated the constitutional rights of Plaintiffs as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution and violative of 42 U.S.C. §1983.

WHEREFORE, Plaintiffs respectfully request this Court provide the following relief:

A) Issue a declaratory judgment that Defendants' policies practices subjected Plaintiff to practices and conditions in violation of the eighth and fourteenth amendments to the United States Constitution and 42 U.S.C. § 1983.

B) Issue an injunction ordering Defendants to provide for appropriate and necessary healthcare that allow Plaintiffs to enjoy equal access to the healthcare services provided by Defendants, and to promulgate policies to ensure the provision of healthcare services to juvenile individuals with disabilities who are under the care, control, and custody of the Nebraska Department of Health and Human Services;

C) General damages for past, present, and future pain, suffering, mental anguish and distress, humiliation, and the loss of her enjoyment of life;

D) Punitive damages for the malicious, oppressive, or reckless disregard of Plaintiffs' rights;

E) Reasonable attorney's fees, costs, and expenses for pursuant to 42 U.S.C. § 1988;

F) For pre-judgment and post-judgment interest at the highest rate allowed by law; and

G) Award any and all other relief that this Court finds necessary and appropriate.

SECOND CAUSE OF ACTION
AMERICANS WITH DISABILITIES ACT AS TO STATE DEFENDANTS AND
INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

100.    Plaintiffs incorporate Paragraphs 1 through 99 as if fully set forth herein.

101.    At all times relevant, 42 U.S.C. §1983 was in full force and effect. Plaintiffs D.S., M.D. and A.W. had their constitutional rights, as set forth in this Complaint, violated by the individual Defendants who were acting under color of state law.

102.    D.S. had been diagnosed with Autism, Oppositional Defiant Disorder, Attention Deficit Hyperactive Disorder, and Disruptive Mood Dysregulation, Hypothyroidism, and Adrenal Insufficiency and is substantially limited in the major life activities of caring for oneself, making medical decisions, thinking and communicating.

103.    M.D. had been diagnosed with Conduct Disorder, Cannabis Use Disorder, PTSD, Alcohol Use Disorder, Bipolar, ADHD, and Anxiety Disorder and is substantially limited in the major life activities of plaintiffs.

104.    At all times relevant, A.W. had been diagnosed with Conduct Disorder, Alcohol Use Disorder, and Cannabis Use Disorder which substantially limited her in one or more major life activities of caring for herself, making medical decisions, and thinking, and communicating.

105.    Plaintiffs are considered individuals with a disability as defined under the ADA, 42 U.S.C. §12102(2)(A).

24

106.    Nebraska Department of Health and Human Services is  a government entity as  defined  under  Title  II  of  the  Americans  with  Disabilities Act, 42 U.S.C. §12131, et. seq.

107.    YRTC-Geneva and  Nebraska Department of Health and  Human Services are  government entities.

108.    YRTC-Geneva and Nebraska Department of Health and Human Services discriminated against D.S., M.D. and A.W. on the basis of their disabilities and Title II of the  ADA by failing to provide reasonable accommodations to receive healthcare, training, treatment and services and by failing to provide these services in the most integrated  setting appropriate  to their needs.

WHEREFORE,  Plaintiffs respectfully request this Court provide the following relief:

A)  Issue a  declaratory judgment  that Defendants' policies  practices subjected Plaintiff to discrimination in violation of Title II of the Americans with Disabilities Act;

B)  Issue an injunction ordering Defendants to provide for appropriate and necessary healthcare that allow Plaintiffs to enjoy equal access to the healthcare services provided  by Defendants,  and  to promulgate policies to ensure the provision of healthcare services to juvenile individuals with disabilities who are  under the care, control, and custody of the Nebraska Department of Health and  Human Services;

C) General damages for past, present, and future pain, suffering, mental anguish and distress, humiliation, and the loss of her enjoyment of life;

D) Punitive damages for the malicious, oppressive, or reckless disregard of Plaintiffs' rights;

E) Reasonable attorney's fees, costs, and expenses for pursuant to 29 U.S.C. 794a(b), and 42 U.S.C. 12205;

F) For pre-judgment and post-judgment interest at the highest rate allowed by law; and

G) Award any and all other relief that this Court finds necessary and appropriate.

## THIRD CAUSE OF ACTION

### REHABILITATION ACT AS TO STATE DEFENDANTS AND INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

109.   Plaintiffs incorporate Paragraphs 1 through 106 as if more fully set forth herein.

110.    Plaintiffs are considered individuals with a disability as defined under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(20)(B).

111.   During all times relevant, Nebraska Department of Health and Human Services and YRTC-Geneva were recipients of federal financial assistance within the meaning of 29 U.S.C. §794(b)(A)(l).

112.   YRTC-Geneva has discriminated against D.S. and M.D. on the basis of their disability, in violation of the Rehabilitation Act of 1973 by failing to provide reasonable accommodations to receive healthcare and services, and

to provide healthcare and services in the most integrated setting appropriate to their needs.

WHEREFORE, Plaintiffs respectfully request this Court provide the following relief:

H) Issue a declaratory judgment that Defendants' policies practices subjected Plaintiff to discrimination in violation of Title II of the Section 504 of the Rehabilitation Act;

I) Issue an injunction ordering Defendants to provide for appropriate and necessary healthcare that allow Plaintiffs to enjoy equal access to the healthcare services provided by Defendants, and to promulgate policies to ensure the provision of healthcare services to juvenile individuals with disabilities who are under the care, control, and custody of the Nebraska Department of Health and Human Services;

J) General damages for past, present, and future pain, suffering, mental anguish and distress, humiliation, and the loss of her enjoyment of life;

K) Punitive damages for the malicious, oppressive, or reckless disregard of Plaintiffs' rights;

L) Reasonable attorney's fees, costs, and expenses for pursuant to 29 U.S.C. 794a(b), and 42 U.S.C. 12205;

M) For pre-judgment and post-judgment interest at the highest rate allowed bylaw;and

N) Award any and  all other relief that this Court finds necessary and

appropriate.

FOR THE PLAINTIFFS,

/s/ Vincent M. Powers
Vincent M. Powers #15866
POWERS LAW
411 South 13th Street, Suite 300
PO Box 84936
Lincoln, NE  68501-4936
402/ 474-8000
powerslaw@me.com

/s/ Scout Richters
Scout Richters #25690
ACLU of Nebraska
134 South 13th Street, #1010
Lincoln, NE  68508
402/476-8091
13richters@aclunebraska.org