IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| M.D., Individually; A.W., Individually; J.P.S., As Parent and Next Friend of D.S., Minor Child; and D.S., Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>DANNETTE SMITH, Chief Executive Officer of the Department of Health and Human Services, Individually; TREVOR SPIEGEL, Individually; and DAN SCARBOROUGH, Individually,<br><br>Defendants. | **4:21CV3315**<br><br><br>**MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| J.P., as Next Friend of A.S.W.; and A.S.W., Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>DANNETTE SMITH, Chief Executive Officer of the Department of Health and Human Services, Individually; TREVOR SPIEGEL, Individually; and DAN SCARBOROUGH, Individually,<br><br>Defendants. | **4:22CV3095**<br><br><br>**MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

In these consolidated cases, Plaintiffs are—or are the next friends of—young women committed as juveniles to the Youth Rehabilitation and Treatment Center at Geneva, Nebraska (YRTC-Geneva), a facility that was closed while they were residents. Case No. 4:21cv3315, Filing 37 at 2 (¶ 6), 3–4 (¶ 14); Case No. 4:22cv3095, Filing 22 at 2 (¶ 8).[1] Defendants are state officials

---

[1] All subsequent citations to the record will be to filings in Case No. 4:21cv3315.

who allegedly were involved in the day-to-day operations of YRTC-Geneva. Filing 37 at 3 (¶ 9). After prior decisions of the Court, Plaintiffs' remaining claims are pursuant to 42 U.S.C. § 1983 for alleged violations of the Eighth and Fourteenth Amendments to the United States Constitution. Filing 43 at 3–4; *see also* Filing 37 at 28–32 (First Cause of Action, Eighth and Fourteenth Amendments as to Individual Defendants in Their Individual Capacities (reduced from all capital letters)). Those claims are based on failure to stop the practice of "solitary confinement" (or "room confinement," as Defendants call it), failure to restaff the facility adequately, and failure to implement rehabilitation and treatment programs at YRTC-Geneva. Filing 145 at 2 (so characterizing remaining claims). This case is now before the Court on Defendants' Motion for Summary Judgment. Filing 129. For the reasons set forth below, Defendants' Motion for Summary Judgment is granted as to both Plaintiffs' Eighth Amendment claim and their Fourteenth Amendment claim.

## I.  INTRODUCTION

### A.  Factual Background

Both Defendants and Plaintiffs have offered comprehensive statements of material facts in support of and resistance to summary judgment. *See* Filing 134 (33 pages and 182 paragraphs of allegations); Filing 144 (20 pages and 116 paragraphs of additional allegations). However, the Court concludes that the dispositive issue at summary judgment is whether Defendants are entitled to qualified immunity; more specifically still, the question is whether each Defendant, occupying a supervisory role as to YRTC-Geneva, "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *See, e.g., Davis v. Buchanan Cnty., Missouri,* 11 F.4th 604, 624 (8th Cir. 2021) (quoting *S.M. v. Krigbaum,* 808 F.3d 335, 340 (8th Cir. 2015)). Thus, the Court will set out only facts necessary for context and related to the conduct of the individual Defendants. Unless otherwise indicated,

the facts set out here are undisputed. By identifying certain factual allegations as disputed, the Court does not mean to suggest in this section that the factual disputes are necessarily material.[2]

### 1.    YRTC-Geneva

YRTC-Geneva was a youth rehabilitation and treatment center (YRTC) that opened in approximately 1891. Filing 134 at 2 (¶ 2). At the time of YRTC-Geneva's closing in 2019, Nebraska had a YRTC in Kearney that served only juvenile males, while YRTC-Geneva served only juvenile females. Filing 150 at 2 (¶ 183). In 1997, oversight of the Office of Juvenile Services (OJS), which in turn had oversight of YRTCs, was transferred from the Nebraska Department of Correctional Services to the Nebraska Department of Health and Human Services (NDHHS). Filing 150 at 2 (¶ 184).

YRTC-Geneva was designed to house troubled youths who had exhausted all levels of probation supervision and appropriate options for community-based services such as group home placement, in-patient treatment, out-patient services, and foster care. Filing 134 at 2 (¶ 2). Before a youth could be committed to YRTC-Geneva, a court had to hold a hearing and find, beyond a preponderance of the evidence, that placement of the youth at a YRTC was a matter of immediate and urgent necessity for the protection of the juvenile or the person or the property of another. Filing 134 at 2 (¶ 3). A youth could also be committed to YRTC-Geneva as a condition of an order of intensive supervised probation if it appeared that the juvenile was likely to flee the jurisdiction of the court. Filing 134 at 2 (¶ 4). Youths placed at a YRTC become wards of the state and are in

---

[2] For Defendants' factual statements that are not disputed, the Court will cite Filing 135. Where they are disputed, the Court will cite Filing 144 for the Plaintiffs' statement of the dispute. Defendants' Responses to Plaintiffs' Additional Factual Statements, Filing 150, includes both Plaintiffs' additional factual statements in Filing 144 and Defendants' responses. Thus, it is unnecessary for the Court to cite Filing 144 for Plaintiffs' additional factual statements. Also, where Plaintiffs' or Defendants' statements of additional facts are redundant of their disputes with factual allegations by the opposing parties, the Court does not always find it necessary to repeat or cite all statements of those allegations.

the legal custody and care of NDHHS for the purposes of obtaining healthcare and treatment services. Filing 144 at 16 (¶ 185).

In February 2019, Defendant Dannette Smith became the Chief Executive Officer (CEO) of NDHHS. Filing 134 at 3 (¶ 11). From April 2018 through March 2020, Defendant Trevor Spiegel served as the Administrator of NDHHS's OJS. Filing 134 at 3 (¶ 13). In 2003, Defendant Dan Scarborough became YRTC-Geneva's Administrator. Filing 134 at 3 (¶ 8). In early June 2019, Scarborough was moved into a different position involving scheduling at YRTC-Geneva and was no longer YRTC-Geneva's Administrator. Filing 134 at 3 (¶ 12). In May 2019, Spiegel took on the administrative duties at YRTC-Geneva and oversaw the day-to-day operations, while Scarborough was no longer involved in the day-to-day operations of that facility. Filing 134 at 3–4 (¶ 14). Thus, beginning in May 2019, Spiegel's main tasks at YRTC-Geneva were to make sure that there was good supervision, make sure there was programming, make sure that school was being offered daily, and make sure that the day-to-day routines of the facility were happening. Filing 134 at 4 (¶ 15).

### 2. Staffing at YRTC-Geneva

When Scarborough was the Administrator, YRTC-Geneva had a psychologist, an Advanced Practice Registered Nurse (APRN), and a Licensed Mental Health Practitioner (LMHP) to perform assessments on the youths, determine what kind of care was needed, and manage the youths' medication. Filing 134 at 4–5 (¶ 20). The parties dispute whether—at least at all times while Defendants were in charge—YRTC-Geneva also contracted with a psychiatrist and had a contract with Fillmore County Medical Center to provide additional or advanced mental health and medical care to the youths who had needs beyond the treatment provided in-house by YRTC-Geneva professionals. Filing 134 at 5 (¶ 21).

Plaintiffs allege the following concerning mental health staffing at YRTC-Geneva:

     191.   In early 2018, YRTC-Geneva's Licensed Clinical Psychologist and Program Director, left to work at Whitehall full-time. The Licensed Clinical Psychologist at YRTC-Kearney, Dr. Van Winkle, was "told to split responsibilities between YRTC-Geneva and YRTC-Kearney and serve as Program Director at both facilities." "There was frustration that the Licensed Clinical Psychologist did not spend more time at YRTC-Geneva because his full-time job was at YRTC-Kearney."

     192.   Both Defendants Spiegel and Smith individually were aware and knew at all relevant times that Cindy Nash left in April, 2018 and was not replaced with a full-time licensed clinical psychologist at Geneva.

Filing 150 at 3–4 (¶¶ 191–192) (record citations omitted). Defendants object to these allegations as hearsay and lacking foundation, but Defendants do not dispute that the allegations in ¶ 191 are found in a Special Report of Investigation by the State of Nebraska Office of Public Counsel/Ombudsman and Office of Inspector General of Nebraska Child Welfare dated January 5, 2021, (Special Report) cited by Plaintiffs. Filing 150 at 4 (¶¶ 191–192); *see also* Filing 133-6 at 213, 497 (Special Report). In their dispute of ¶ 192, Defendants assert that Nash was temporarily replaced with a YRTC-Kearney psychiatrist. Filing 150 at 4 (¶ 192).[3]

In June 2019, in her role as CEO of NDHHS, Smith brought Dr. James Sorrell, a psychiatrist, into YRTC-Geneva to look at treatment planning and medication management to make sure that treatment for the youths was happening and to make sure that the medications were applicable to how the youths were receiving treatment. Filing 134 at 5 (¶ 24). Smith believes that Dr. Sorrell looked at the treatment plans for every youth at YRTC-Geneva. Filing 134 at 5 (¶ 25). Dr. Sorrell began treatment team meetings with the YRTC-Geneva staff so that the staff was aware of the clinical needs of the youths. Filing 134 at 6 (¶ 27). In June 2019, Smith hired Dr. Janine

---

[3] Defendants also assert that Plaintiffs "mischaracterize" Scarborough's statement, which was that Spiegel and Smith knew Nash left YRTC-Geneva "at some point." Filing 150 at 4 (¶ 192). However, the cited pages of Scarborough's depositions state that Nash "left in April of 2018 and was not replaced," and Scarborough answered "yes" to questions about whether Spiegel and Smith knew that Nash left. Filing 133-6 at 150. The Court does not believe that Plaintiffs "mischaracterized" Scarborough's testimony in this instance.

Fromm, a psychiatrist, as executive medical director, and Dr. Fromm oversaw all behavioral health programs. Filing 134 at 6 (¶ 28). Smith was also in conversations with Boys Town to provide telemedicine for the youths at YRTC-Geneva. Filing 134 at 6 (¶ 29).

All Defendants tried to keep YRTC-Geneva fully staffed when there were staffing vacancies. Filing 134 at 6 (¶ 30). To try to recruit staff for YRTC-Geneva, Scarborough, Smith, and NDHHS human resources and administration would post flyers, host job fairs, go into the community to encourage people to be employed at YRTC-Geneva, rely on word of mouth, and have discussions with local colleges to see if NDHHS could recruit staff for YRTC-Geneva. Filing 134 at 6 (¶ 32). In addition, to address the staffing shortages or vacancies at YRTC-Geneva, Defendants would bring in staff members from other YRTC facilities, such as YRTC-Kearney, YRTC-Whitehall, and YRTC-Hastings, to support YRTC-Geneva's operations and to fill such shortages or vacancies. Filing 134 at 6 (¶ 33); Filing 134 at 7 (¶ 35). However, Plaintiffs allege that the loss of specific people integral to the YRTC-Geneva program, the requirement that several key positions oversee more than one facility, and the unfilled positions vital to the functioning of YRTC-Geneva resulted in a weakening of the YRTC-Geneva facilities management and compromised the ability of staff to care for and supervise the youths. Filing 150 at 5–6 (¶¶ 196–197). Plaintiffs allege that Smith, Spiegel, and Scarborough failed to ensure that YRTC-Geneva had the necessary and required management, staffing, programming, treatment, and facilities for the youths in custody at YRTC-Geneva, including Plaintiffs. Filing 150 at 17 (¶ 222). Defendants dispute these allegations on the grounds that they are hearsay, lack foundation, and mischaracterize the evidence, because of Spiegel's efforts to fill vacancies after he took over administration in May 2019. Filing 150 at 6 (¶¶ 196–197), 17 (¶ 222). Nevertheless, the parties do not dispute that from the fall of 2018 until YRTC-Geneva was closed, there was no facility operating officer because

6

that person had resigned in early fall 2018. Filing 150 at 8 (¶ 200). The parties agree that Smith and Scarborough were aware that YRTC-Geneva lacked sufficient counselors. Filing 150 at 25 (¶ 245).

### 3.    Training at YRTC-Geneva

Plaintiffs also allege that YRTC-Geneva staff were given only "minimal" training. Filing 150 at 6 (¶ 198). Defendants dispute that allegation on the ground that Smith, Spiegel, and Scarborough described training that they and staff received, including physical intervention training for YRTC-Geneva supervisors. Filing 150 at 7 (¶ 198). The parties do not dispute that Smith never had any education or training on the effects of solitary confinement or room confinement with respect to an adult or a juvenile nor did she impose or implement any training on room confinement for the staff. Filing 150 at 31 (¶ 264). Plaintiffs allege that Scarborough also did not have any training on the effect of room confinement on an individual or a juvenile. Filing 150 at 38 (¶ 291) (citing Filing 133-6 at 143). However, Defendants dispute that allegation on the ground that Scarborough testified that he did not recall whether he received training on the effect of room confinement on an individual or a juvenile, but Defendants assert that records show that Scarborough did in fact receive annual and ongoing training on room confinement and was part of an initiative to work on the reduction of the use of room confinement. Filing 150 at 38 (¶ 291) (citing Filing 133-6 at 143; Filing 134 at 3 (¶ 10), 9 (¶ 55)).

### 4.    Programming at YRTC-Geneva

Defendants allege that YRTC-Geneva offered a variety of programming to the youths there, including an educational program that was accredited by the Nebraska Department of Education and AdvancED, and programming relating to vocational needs, cosmetology, family consumer sciences, parenting, independent living, religion, and various recreational activities, although it is not clear whether this allegation is limited to the time that Scarborough was the

Administrator. Filing 134 at 15 (¶ 103). Plaintiffs dispute this fact as to one circumstance after

Scarborough was no longer the Administrator, specifically,

> By June 2019, the OJS Administrator [Spiegel not Scarborough] discontinued the
> levels program at YRTC-Geneva. This was done with no intervention or program
> to replace the system. The youth[s] were receiving little to no programming and
> treatment, now had no behavior modification plan to improve their behavioral
> outcomes, and their daily routine and structure was compromised.

Filing 144 at 11 (¶ 103); *see also* Filing 150 at 10 (¶ 207). Defendants respond that Spiegel

eliminated the program because he believed it was being manipulated and that YRTC-Geneva

continued to offer a variety of programming and treatment. Filing 150 at 10–11 (¶ 207).

    *5.*    *"Room Confinement" or "Solitary Confinement" at YRTC-Geneva*

One of the central issues in this case is the use of what Plaintiffs call "solitary confinement"

but Defendants call "room confinement." Indeed, the parties hotly dispute what confinement of a

youth alone in a room should be called. *Compare*, *e.g.*, Filing 134 at 7 (¶ 37) (Defendant's use of

"room confinement"); Filing 150 at 14 (¶ 217) ("Defendants object to Plaintiffs' use of the term

'solitary confinement' as Plaintiffs admit that room confinement is the appropriate term pursuant

to YRTC-Geneva's Operational Memorandum."), *with, e.g.,* Filing 150 at 14 (¶ 217) (Plaintiff's

allegation, "When youth[s] were alone in a room[,] whether the term is 'room confinement' or

'solitary confinement,' there was no phone, radio or tv for the youth[s] to use and they would not

typically be taken out of the room."), 14 (¶ 218) (Plaintiff's allegation, "The use of solitary

confinement was pervasive and well-documented."). The Court will not engage with unnecessary

disputes over nomenclature and semantics. Rather, the Court will call such confinement "room

confinement" consistent with the applicable YRTC-Geneva policy, recognizing that the real issue

is whether such confinement—whatever it was called—was punitive or otherwise

unconstitutional.

Defendants point to YRTC-Geneva's Operational Memorandums (OM) 302.1.5 and OM 302.1.5(B) as defining YRTC-Geneva's "Room Confinement Policy" (the Policy). Filing 134 at 7–9 (¶¶ 37–52). Plaintiffs admit that this Room Confinement Policy was approved by NDHHS Administration and was modeled on American Correctional Association national standards. Filing 134 at 7 (¶ 38). On the other hand, Plaintiffs assert an identical objection to Defendants' statements of fact in ¶¶ 42 through 52 concerning this Policy: "The Defendants merely cite to a policy but do not present any evidence to support [these paragraphs]." Filing 134 at 8–9 (¶¶ 42–52). Plaintiffs dispute other factual statements as the Court will explain to the extent that they are pertinent. The Court concludes that the Policy—which is in the record—is the best evidence of its terms.

OM 302.1.5, § V., defines Room Confinement as follows:

A.    Room confinement per Nebraska State Statute 83-4, 134.01 means the involuntary restriction of a juvenile alone in a locked or unlocked cell, room, or other area, including a juvenile's own room, except during normal sleeping hours, with minimal or no contact with persons other than facility staff and attorneys.

    1.    Room confinement of a juvenile for longer than one hour shall be documented and approved in writing by the Facility Administrator, Facility Operating Officer, or designee. Additionally, room confinement exceeding 4 hours must also be approved by the Facility Administrator, Facility Operating Officer, or designee.

* * *

B.    The intent of room confinement is to help the juvenile bring her behavior into control so that she may be returned to her regular program in the shortest amount of time possible, while also ensuring the safety, security, and good order of the facility.

Filing 133-5 at 24 (OM 302.1.5, § V.A.1. and B.); *see also* Filing 133-5 at 39 (OM 302.15(B), "General," stating the same definition and intent). In disputing Defendants' definition of room confinement, Plaintiffs point to a different definition purportedly also from NDHHS rules and regulations, found in an appendix to the Special Report. Filing 144 at 4 (¶ 39) (citing Filing 133-6

at 535); *see also* Filing 133-6 at 46 (same definition).[4] The parties do not explain why the definitions are different, but the Court concludes that the difference is not material. Defendants allege that YRTC-Geneva actually documented and created an annual report of each instance of room confinement, which Plaintiffs dispute only on the basis of lack of information. Filing 134 at 9 (¶ 54).

The Policy states,

> D.     A juvenile may be placed in room confinement if:
>
>     1.     She is an imminent threat to herself, others [sic] persons, or the safety/security or good order of the facility;
>
>     2.     Other strategies are not appropriate because of the seriousness of her actions and/or threat of her continuing her actions.

Filing 133-5 at 24 (OM 302.1.5, § V.D.). As to the room confinement process, the Policy states,

> A.     When a juvenile is placed in room confinement, she changes into room confinement clothing, the appropriate paperwork is completed, and 15 minute checks begin.

Filing 133-5 at 28 (OM 302.1.5, § VI.A.).

The Policy also provides for "time-outs," as follows:

> A.     <u>Self-Initiated Timeout</u> – A juvenile voluntarily requests a timeout or time in her room. Checks are required on this juvenile and a Time Out Notification form must be completed. Because a juvenile is requesting time on a voluntary status, this time does not count as "confinement" per the legislative definition.
>
> B.     <u>Staff Directed Timeout</u> – The involuntary restriction of a juvenile to their room as directed by staff; used for the purposes of addressing escalating behavior and attempting to de-escalate such behavior. Checks are required and the Time Out Notification form must be completed.

Filing 133-5 at 30 (OM 302.1.5, § VII.A.–B.).

---

[4] The version of the definition that Plaintiffs cite states that room confinement is "the involuntary restriction of a juvenile alone in an area other than their sleeping quarters for the purpose of helping the juvenile who is an imminent threat to herself, other persons, or the safety/security or good order of the facility." Filing 133-6 at 535.

Under the Policy, a youth may also be placed in room confinement for "Safekeeping."

Filing 134 at 8 (¶ 47). Specifically, the Policy states,

A. Safekeeping involves removing the juvenile from the general operation and placement in a room other than their sleeping quarters. Safekeeping is not a disciplinary measure and no sanctions may be applied to juveniles because they were placed in safekeeping. The Room Confinement notification form will be completed by staff for all juveniles in safekeeping.

The Facility Administrator, Facility Operating Officer, or OD may order immediate placement of a juvenile in a special unit when it is necessary to protect the juvenile from herself or others. This is reviewed within 72 hours by the Facility Administrator or Facility Operating Officer with input from the treatment team and classification committee. (4-JCF-3C-01)

Filing 133-5 at 31 (OM 302.1.5, § VIII.A.). The Policy provides that "[j]uveniles may be placed in safekeeping for the following reasons: 1. Investigative Safekeeping (Administrative) . . . , 2. Investigative Safekeeping (County Attorney) . . . , [and] 3. Protective Safekeeping. . . ." Filing 133-5 at 31–32.

Defendants allege that when a youth was placed in room confinement, the youth was regularly visited by YRTC-Geneva staff and provided with resources. Filing 134 at 9 (¶ 53). Plaintiffs dispute that allegation and assert instead that a review of facility video footage, daily logbooks, and room confinement reports showed instances where youths in confinement did not have an appropriate place to sleep, rooms with working light fixtures, access to programming including educational services, physical exercise, and appropriate mental health services. Filing 144 at 5 (¶ 53); Filing 144 at 12 (¶ 213). Defendants dispute Plaintiffs' statement on the ground that the statement lacks foundation and contains legal conclusions adding that "the alleged facility video footage, daily logbooks, submitted juvenile room confinement reports and interviews are not part of the summary judgment record." Filing 150 at 13 (¶ 213). On the other hand, Defendants affirmatively state, "Plaintiffs' YRTC-Geneva confinement records and related documentation show that Plaintiffs' confinements complied with YRTC-Geneva policies." Filing 150 at 13

(¶ 213) (citing Filing 130-3, 131-1, 131-2, 132-1, 132-2, 133-1, 133-2). Plaintiffs also allege generally that when a youth was placed in room confinement, she was alone, without access to the internet, television, or radio, and that Smith knew that, although Plaintiffs do not allege that this was the case with any particular Plaintiff. Filing 150 at 34 (¶ 278). Defendants do not dispute that statement, but they affirmatively state that the youths had access to books, schoolwork, and a therapist. Filing 150 at 34–35 (¶ 278).

Plaintiffs allege, "When [D.S.] was in room confinement, even though staff were supposed to check on her every fifteen minutes, they would only check on her every thirty minutes or hour." Filing 150 at 21 (¶ 231). Defendants dispute this allegation, asserting that it is hearsay, lacks foundation, and mischaracterizes D.S.'s testimony, which they contend stated that staff could perform "10-minute safety checks, 15. So I don't think it's supposed to go to 30 but, like I said, they weren't doing regular ones." Filing 150 at 21 (¶ 231). The part of D.S.'s deposition cited by both Plaintiffs and Defendants indicates Defendants accurately quoted D.S.'s testimony, while Plaintiffs' characterization of her testimony is not accurate. *See* Filing 133-6 at 48. Plaintiffs also allege, "While in confinement [D.S.] would not always receive a proper bed—at most it was a 'mat'[—]and she would have to use her shirt and pants to stay warm." Filing 234 at 22 (¶ 234) (citing Filing 133-6 at 48). Defendants dispute this allegation on the ground that the rooms that were used for confinement had beds. Filing 150 at 22 (¶ 133-6 at 444). Defendants' citation is to deposition testimony of Spiegel, in which he was asked the physical condition of the rooms used for room confinement, and he responded, "[T]here's a bed in there. . . ." Filing 133-6 at 444. Spiegel's testimony at most suggests that generally the rooms used for confinement had beds. When D.S. was asked in her deposition to describe the bed she slept in when she was in confinement, D.S. responded,

It was like -- it was like a mat, kind of. It wasn't a bed and I wouldn't get one 100 percent of the time. There would be nights where I'd sleep with no bed. It's up to them.

Filing 133-6 at 48. When asked if she would sleep on the floor when she had no bed, D.S. responded, "I would curl up in the shirt and pants I have to get warm." Filing 133-6 at 48. D.S.'s testimony was that she did not always have a bed in confinement, but D.S. did not testify that any Defendants knew she had no bed on any occasion while in room confinement, nor have Plaintiffs pointed to any evidence that Defendants ever knew any youths had no beds while in room confinement.

Defendants allege that being placed in room confinement was neither a punishment nor a disciplinary measure. Filing 134 at 10 (¶ 57). Plaintiffs assert that YRTC-Geneva staff frequently confined youths to control, discipline, and punish them, citing Plaintiffs' testimony about what they believed were arbitrary and punitive reasons that YRTC-Geneva staff confined them. Filing 144 at 6 (¶ 57); Filing 150 at 19 (¶ 226). Defendants respond that using room confinement to "control" youths does not mean that confinement was used to punish or discipline youths. Filing 150 at 19 (¶ 226). Defendants also allege that they never had any concerns with the use of room confinement, because room confinement was used in accordance with the YRTC-Geneva Policy and only when necessary. Filing 134 at 10 (¶ 60). Plaintiffs dispute this allegation on the ground that Smith "had concerns" about the use of room confinement at YRTC-Geneva and on the ground that Plaintiffs testified about improper use of room confinement. Filing 144 at 6–7 (¶ 60); Filing 150 at 29 (¶ 258). Defendants respond by clarifying that Smith testified that her "concerns" were, "I wanted to just make sure that girls were appropriately being supervised and cared for, that the surroundings were good," and that to her knowledge the youths were taken out to get meals and do activities. Filing 150 at 29 (¶ 258) (citing Filing 133-6 at 331).

6. *Conduct of Individual Defendants*

a. Dannette Smith

Dannette Smith had oversight of YRTC-Geneva after she became CEO of NDHHS. Filing 150 at 24 (¶ 241). She was briefed on the YRTCs at the time she was hired, including the youths in the care of the YRTCs, the YRTCs' staffing levels, and the YRTCs' programming. Filing 150 at 24 (¶ 242).

Smith visited YRTC-Geneva "on multiple occasions" after she became the CEO of NDHHS. Filing 134 at 12 (¶ 74) (undisputed allegation); *but see* Filing 150 at 24–25 (¶ 243) (disputed allegation that Smith only visited YRTC-Geneva twice in May 2019). Smith was not involved in any disciplinary decisions for the youths at YRTC-Geneva, although Plaintiffs allege that "Smith was aware of the use of room confinement and had concerns about the use of room confinement at YRTC-Geneva." Filing 134 at 12 (¶ 75); Filing 144 at 8 (¶ 75). Smith also was not aware of any allegations of "physical neglect" of a youth by a YRTC-Geneva staff member, but Plaintiffs allege that "[r]oom confinement is a form of 'physical neglect'" and that "Smith was made aware that 'room confinement' was being used for youth[s] at YRTC-Geneva." Filing 134 at 12 (¶ 76); Filing 144 at 8 (¶ 76). Plaintiffs do not dispute that Smith never had any personal involvement in making any medical or mental health decision for M.D., A.W., D.S, or A.S.W. Filing 134 at 12 (¶¶ 77–80). Indeed, Smith never had any personal involvement in making medical or mental health decisions for any of the youths at YRTC-Geneva; instead, she relied on her qualified staff, such as psychologists, psychiatrists, and nurses, to make such decisions. Filing 134 at 12–13 (¶ 81).

The Court will set out below allegations about Smith's involvement in "cadence calls," and the Court set out above allegations about Smith's involvement in attempting to maintain adequate staffing at YRTC-Geneva. However, the parties agree that YRTC-Geneva was not fully staffed

14

during Smith's tenure. Filing 150 at 27 (¶ 254). The parties agree that on August 19, 2019, Smith made the decision to close YRTC-Geneva and move the youths to Kearney. Filing 150 at 17 (¶ 221). They disagree on Smith's reasons. Plaintiffs at least imply that the reason was that "Smith was aware of the conditions at the YRTC-Geneva. . . ." Filing 150 at 17 (¶ 221). Defendants respond that Smith made the decision to close YRTC-Geneva because she did not have enough staff or programming, and the youths could not be accommodated in the buildings they were using. Filing 150 at 17 (¶ 221). Defendants add that Smith had to get the Governor's approval to move the youths to Kearney. Filing 150 at 17 (¶ 221).

> b.  Trevor Spiegel

After Spiegel replaced Scarborough as Administrator at YRTC-Geneva in May 2019, Spiegel and Smith would talk daily on "cadence calls," where they would discuss issues with the youths, make sure that they were looking at staff ratios, hiring, how the programs were going, and other issues critical to the success of the YRTC-Geneva program. Filing 134 at 13 (¶ 82). Defendants allege that "cadence calls" were also used to check in on a daily basis to make sure that everyone was abreast of what was occurring at YRTC-Geneva at each of the cottages and that appropriate steps were being taken to make sure the youths were safe and being taken care of. Filing 134 at 13 (¶ 83). Plaintiffs dispute this allegation as to whether appropriate steps were being taken to make sure the youths were safe and being taken care of, again citing materials not in the record but only listed in the Special Report. Filing 144 at 8–9 (¶ 83) (citing Filing 133-6 at 222 and Filing 133-6 at 506). On the other hand, the parties do not dispute that multiple individuals from NDHHS and YRTC-Geneva would usually participate in cadence calls. Filing 134 at 13 (¶ 85). Nor do they dispute that in addition to the cadence calls, Spiegel had multiple calls with Smith on a daily basis to discuss the use of room confinement, who was in room confinement, how

long the youths had been in room confinement, and what the youths needed to do to get out of room confinement. Filing 134 at 13 (¶ 84).

In May 2019, Spiegel made changes to YRTC-Geneva's programming and eliminated the "levels program." Filing 134 at 13 (¶ 87). The "levels program" involved youths housed at YRTC-Geneva wearing different color shirts to identify the "level" they had achieved as they moved through the YRTC-Geneva program. Filing 134 at 13–14 (¶ 88). Spiegel eliminated the levels program because he thought the program was being easily manipulated by some of the youths at YRTC-Geneva and that the program provided an advantage to those youths. Filing 134 at 14 (¶ 89). Plaintiffs allege that without the levels program, the youths had nothing to work toward and "just started destroying everything." Filing 150 at 5 (¶ 195); *see also* Filing 150 at 10 (¶ 207). Defendants dispute this allegation as hearsay and lacking foundation, on the ground that programming was available, and on the ground that A.W., A.S.W., and M.D. availed themselves of that programming. Filing 150 at 5 (¶ 195).

Defendants allege that Spiegel was not aware of any allegations of physical neglect of a youth by a YRTC-Geneva staff member, but Plaintiffs allege that incidents of physical neglect nevertheless occurred. Filing 134 at 14 (¶ 91); Filing 144 at 9 (¶ 91). Like Smith, Spiegel never had any personal involvement in making any medical or mental health decision for M.D., A.W., D.S, or A.S.W. Filing 134 at 14 (¶¶ 92–95). Defendants allege that Spiegel never had any personal involvement in making medical or mental health decisions for any of the youths at YRTC-Geneva; that he never had the ability to review any of the medical or mental health decisions made for any of the youths at YRTC-Geneva; and that he was not aware of any of the medical or mental health recommendations for any of the youths at YRTC-Geneva, citing his deposition testimony. Filing 134 at 14–15 (¶¶ 96–98). Plaintiffs dispute these allegations. First, Plaintiffs allege that Spiegel

16

had the responsibility and authority to fill positions for mental health professionals but failed to fully staff the medical staff while he was OJS Administrator. Filing 144 at 10 (¶ 96). However, that statement is not responsive to the allegation that Spiegel had no personal involvement in making medical or mental health decisions for youths at YRTC-Geneva. Filing 134 at 14 (¶ 96). On the other hand, Plaintiffs' allegation that Spiegel reviewed the evaluations and recommendations of Dr. Van Winkle, a psychologist, when a youth arrived at YRTC-Geneva to "learn about the girl," based on Spiegel's deposition testimony, Filing 144 at 10 (¶ 97); Filing 144 at 10 (¶ 98) (same response), properly disputes the allegations that Spiegel never had the ability to review and was not aware of medical and mental health recommendations for youths at YRTC-Geneva. Filing 150 at 14–1 (¶¶ 97–98).

### c. Dan Scarborough

Scarborough never had any personal involvement in making any medical or mental health decisions for D.S., as he was not the Administrator for YRTC-Geneva at the time that she was committed, or for A.W., as he was transitioning from his role as Administrator when she was committed. Filing 134 at 15–16 (¶¶ 104, 107). Any decisions related to the medical care or mental health of M.D. and A.S.W. were made within medical and clinical standards by certified staff, not by Scarborough. Filing 134 at 15–16 (¶¶ 105–106). Defendants allege that Scarborough does not recall any conversation with Spiegel or Smith in which they advised that a specific youth should never go into room confinement. Filing 134 at 15 (¶ 101). Plaintiffs dispute this allegation on the nonresponsive ground that Scarborough was "sometimes" included in the daily cadence calls organized by Smith about the ongoing conditions and operations of YRTC-Geneva, which sometimes discussed the use of room confinement. Filing 144 at 10 (¶ 101).

The Court will address further factual allegations and record evidence as necessary in its legal analysis below.

17

## B. Procedural Background

Case No. 4:21cv3315 was originally filed in state court more than three years ago on October 19, 2021. Filing 1-1 at 1. It was removed to this Court on November 19, 2021. Filing 1. Case No. 4:22cv3095 was originally filed in state court nearly three years ago on April 18, 2022. It was also removed to this Court on May 20, 2022. The cases were consolidated on June 27, 2022, with Case No. 4:21cv3315 as the lead case. Filing 30. Because the cases have been pending for three years or more, the Court does not find it necessary to recount every procedural step on the way to the Motion for Summary Judgment now before the Court. What is significant for present purposes is that, after prior decisions of the Court, Plaintiffs' remaining claims are pursuant to 42 U.S.C. § 1983 for alleged violations of the Eighth and Fourteenth Amendments to the United States Constitution. Filing 43 at 3–4; *see also* Filing 37 at 28–32 (First Cause of Action, Eighth and Fourteenth Amendments as to Individual Defendants in Their Individual Capacities (reduced from all capital letters)).

This case is now before the Court on Defendants' Motion for Summary Judgment. Filing 129. Defendants assert that Plaintiffs' Eighth Amendment claim applies only to convicted criminals, not adjudicated youths in a juvenile rehabilitation facility, so Defendants are entitled to summary judgment on that claim. Filing 135. Plaintiffs do not contest summary judgment on their Eighth Amendment claim. Filing 145 at 28–29. As to the Fourteenth Amendment claim, Defendants assert that Plaintiffs fail to meet their burden to show that Defendants acted with deliberate indifference to or violated a constitutional right and that Defendants are therefore entitled to qualified immunity. Filing 135 at 2. Plaintiffs maintain that their Fourteenth Amendment claim should go to a jury. Filing 145 at 29.

Defendants sought summary judgment on a claim that they allegedly subjected Plaintiffs to uninhabitable living conditions. *See, e.g.,* Filing 135 at 2, 26–27. However, Plaintiffs have not

offered any resistance to summary judgment on any claim of uninhabitable conditions at YRTC-Geneva. *See generally* Filing 145. Thus, any such claim is waived. *See United States v. Cooper*, 990 F.3d 576, 583 (8th Cir. 2021) ("Ordinarily, a party's failure to make an argument in its opening brief results in waiver of that argument."); *Montin v. Moore*, 846 F.3d 289, 295 (8th Cir. 2017) ("Because [c]laims not raised in an opening brief are deemed waived, and [appellant] failed to address the . . . claim in his opening brief, [appellant] waived this issue." (cleaned up)). Plaintiffs' remaining Fourteenth Amendment claim is based on failure to stop the practice of "solitary confinement" (or "room confinement," as Defendants call it), failure to restaff the facility adequately, and failure to implement rehabilitation and treatment programs at YRTC-Geneva. Filing 145 at 2 (so characterizing remaining claims).

The Court now turns to disposition of Defendants' Motion for Summary Judgment on the parts of Plaintiffs' Fourteenth Amendment claim still at issue.

## II.  LEGAL ANALYSIS

As the Court indicated above in a preface to its statement of the factual background, the Court concludes that the dispositive issue at summary judgment is whether Defendants are entitled to qualified immunity; more specifically still, the question is whether each Defendant, occupying a supervisory role as to YRTC-Geneva, "(1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *See, e.g., Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015)). That question is the focus of the Court's decision, so the Court begins its legal analysis with summaries of the standards for summary judgment and for consideration of qualified immunity of supervisory officials at summary judgment.

### A. Applicable Standards

#### 1.    Standards for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) ("An issue is genuine if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." (quotations omitted)).

Focusing on the non-movant's burden, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Jones*, 77 F.4th at 662–63 (quoting *Torgerson*, 643 F.3d at 1042). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Jones*, 77 F.4th at 663 (quoting *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007)). Similarly, "[t]o create a genuine dispute of fact, 'the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Johnson v. Midwest Div. - RBH, LLC*, 88 F.4th 731, 736 (8th Cir. 2023) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 252).

As to the Court's burden, "at summary judgment, it is not the role of the district court to weigh competing evidence or 'attempt to discern the truth of any factual issue.'" *Hall*, 77 F.4th at

1182 (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). "Genuine disputes of material fact are for a factfinder to resolve." *Liberty Ins. Corp.*, 87 F.4th at 889. Thus, "[s]ummary judgment is available when there is 'no genuine issue of material fact' and 'the evidence, viewed in a light most favorable to the nonmoving party, shows . . . the [moving party] is entitled to judgment as a matter of law.'" *Id.* at 888 (quoting *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130, 1134 (8th Cir. 2020)); *Nieters v. Holtan*, 83 F.4th 1099, 1105 (8th Cir. 2023) ("Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law."). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute [as to] those facts." *Johnson*, 88 F.4th at 736 (quoting *Torgerson*, 643 F.3d at 1042).

> 2.    *Standards for Qualified Immunity*

"Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of the rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wagner v. Jones*, 664 F.3d 259, 268 (8th Cir. 2011) (citing 42 U.S.C. § 1983 and *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009)). When a state actor is sued in his or her individual capacity, the state actor can plead an affirmative defense of qualified immunity. *Id.* (citing *Serna v. Goodno*, 567 F.3d 944, 952 (8th Cir. 2009)). However, "[q]ualified immunity is normally 'an immunity from suit rather than a mere defense to liability.'" *Ledbetter v. Helmers*, No. 24-1427, 2025 WL 996701, at *4 (8th Cir. Apr. 3, 2025) (quoting *Watson v. Boyd*, 2 F.4th 1106, 1110 (8th Cir. 2021), in turn quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Consequently, "the policies behind the doctrine . . . include 'resolving immunity questions at the earliest possible stage in litigation.'" *Ryno v. City of Waynesville*, 58 F.4th 995, 1004 (8th Cir. 2023) (quoting *Pearson*, 555 U.S. at 232).

Here, Defendants are all supervisory or managerial officials, and there are no allegations that they directly participated in any violation of any Plaintiff's Fourteenth Amendment rights. Consequently, they may only be liable under § 1983 if their "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 624 (8th Cir. 2021) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)). As to qualified immunity of supervisory or managerial officials, the Eighth Circuit explained,

> When a "supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015), citing *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012); *Andrews*, 98 F.3d at 1078 (same).

> This "rigorous standard" requires proof that the "supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right." *Krigbaum*, 808 F.3d at 340. "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. City of Mtn. View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). "Allegations of generalized notice are insufficient." *Krigbaum*, 808 F.3d at 340. "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Id.* (citation omitted). In other words, the supervisor must have "notice of a pattern of conduct that was sufficiently egregious in nature." *Id.* A "single incident, or a series of isolated incidents, is usually insufficient to infer a pattern." *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018), citing *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989). *See Mick v. Raines*, 883 F.3d 1075, 1080 (8th Cir. 2018) ("affidavits of three detainees describing alleged constitutional violations are not sufficient to establish a genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, known to and unaddressed by policymaking officials."). Similarly, a "number of individual and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference without some specific threat of harm from a related system wide deficiency ...." *Dulany v. Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997) (alteration added). A supervisor's "mere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983." *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994) (citation omitted).

22

*Davis*, 11 F.4th at 624–25; *Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018) ("When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." (quoting *Krigbaum*, 808 F.3d at 340)). To put it briefly, "[q]ualified immunity from supervisory liability turns on what [a supervisor] knew of [an offending actor's] actions." *Marsh*, 902 F.3d at 755.

"'When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard' that requires personal knowledge of the constitutional risk posed by inadequate supervision." *S.M. v. Lincoln Cnty.*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Krigbaum*, 808 F.3d at 341). Under this subjective standard, the "deliberate indifference" standard "entails a level of culpability equal to the criminal law definition of recklessness." *Krigbaum*, 808 F.3d at 341 (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012)). The Eighth Circuit Court of Appeals has explained,

> "[Plaintiffs] must prove [the supervisor] *personally knew* of the constitutional risk posed by [his] inadequate training or supervision" of [an employee]. *Walton [v. Dawson]*, 752 F.3d [1109,] 1118 [(8th Cir. 2014)]. To be deliberately indifferent, an "official must both be aware of facts from which the inference could be drawn that a substantial risk of [unconstitutional] harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

*Krigbaum*, 808 F.3d at 341 (emphasis in the original). Furthermore,

> [The supervisor] could not be *deliberately* indifferent in failing to satisfy a duty he did not know he had. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see Daniels v. Williams*, 474 U.S. 327, 329–30, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The claim that [the supervisor] unreasonably failed to exercise a duty to supervise [an employee] to prevent him from harming plaintiffs "is a claim of negligence that

cannot be the basis of a constitutional tort claim." *Moore v. Briggs*, 381 F.3d 771, 774 (8th Cir. 2004) (quotation omitted).

*Krigbaum*, 808 F.3d at 341–42 (emphasis in the original) (rejecting the argument that "[f]ailing to supervise when one has a duty to supervise is to be deliberately indifferent").

### B. Plaintiffs' Fourteenth Amendment Claim

Again, Plaintiffs' Fourteenth Amendment claim is based on failure to stop the practice of "solitary confinement" (or "room confinement," as Defendants call it), failure to restaff the facility adequately, and failure to implement rehabilitation and treatment programs at YRTC-Geneva. Filing 145 at 2 (so characterizing remaining claims). The Court deems it appropriate to consider in turn the three parts of Plaintiffs' Fourteenth Amendment claim.

#### 1.    *The Confinement Claim*

##### a.   The Parties' Arguments

In pertinent part, Defendants argue that brief instances of confinement, without serious additional factors, are not objectively serious enough to violate the Constitution. Filing 135 at 21. Defendants argue that YRTC-Geneva's policy governing room confinement dictated that room confinement was not used for punishment or as a disciplinary measure but to help a juvenile bring her behavior into control so that she could return to regular programming in the shortest amount of time necessary. Filing 135 at 22.[5] Defendants assert that Plaintiffs' allegation that Defendants subjected Plaintiffs to inappropriate and harmful use of solitary confinement and confined Plaintiffs well beyond policy limits simply are not true. Filing 135 at 23. Defendants point out that these allegations are not supported by YRTC-Geneva's annual report of each instance of room confinement. Filing 135 at 23–24. Likewise, Defendants argue that Plaintiffs' allegations that they

---

[5] Defendants also point out that D.S. self-requested time-outs eight times at YRTC-Geneva; M.D. self-requested 31 time-outs; A.W. self-requested 20 time-outs; and A.S.W. self-requested 142 time-outs. Filing 135 at 22 (citing Filing 134 at 17 (¶ 116), 19–20 (¶ 135(a)), 24 (¶ 141), and 27–28 (¶ 172), respectively).

were confined for "no reason at all" are contrary to YRTC-Geneva's extensive documentation. Filing 135 at 24–25. Defendants contend that the record shows beyond dispute that Plaintiffs were confined in accordance with YRTC-Geneva policy, for their own safety, the safety of others, "time-outs," or safekeeping, and that no Plaintiff was confined for weeks and months on end, as Plaintiffs allege. Filing 135 at 25.

Plaintiffs argue that they do not have to show that Defendants were personally involved in or directly responsible for the alleged deprivation of Plaintiffs' rights because a failure-to-supervise claim may be maintained when an official was deliberately indifferent to or tacitly authorized offensive acts. Filing 145 at 18. They argue that deliberate indifference can be shown if supervisors failed to take corrective action or if they knew about the violation and conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see. Filing 145 at 19. Plaintiffs argue that each Defendant demonstrated deliberate indifference because each knew that Plaintiffs were being subjected to solitary confinement and at a substantial risk of harm in violation of their due process rights yet failed to stop the practice. Filing 145 at 20. More specifically, Plaintiffs argue that Smith was involved in operations of YRTC-Geneva on a daily basis, which included reviews of the use of room confinement. Filing 145 at 20–21. They also argue that Smith knew specifically that solitary confinement was frequently used on the youths at YRTC-Geneva and had concerns that the youths were being appropriately supervised. Filing 145 at 21. Plaintiffs argue that Scarborough knew that solitary confinement was being used intentionally on youths at YRTC-Geneva but he was not aware of any effort by any Defendants including himself to reduce it or to keep a youth out of solitary confinement. Filing 145 at 21. Plaintiffs argue that Speigel was in daily contact with Smith about the use of solitary confinement but made no effort to achieve the goal of reducing its use. Filing 145 at 22.

In reply, Defendants argue that Plaintiffs must show that each individual Defendant knew about specific unconstitutional actions in relation to the use of room confinement. Filing 149 at 3. However, they point out that the evidence of Smith's "concerns" about the use of room confinement that Plaintiffs cite makes clear that Smith did not have any knowledge of unconstitutional conduct and that her concerns were only that room confinement was being used appropriately. Filing 145 at 5. Defendants acknowledge that Scarborough knew that room confinement was used and that someone intentionally employed the practice, but Defendants argue that the record does not show that Scarborough was actually aware that any individual Plaintiff was subjected to specific instances of solitary confinement or that he or any other Defendant actually ordered any Plaintiff into solitary confinement. Filing 149 at 6. Defendants also argue that the record does not show that Scarborough was actually aware that any Plaintiff would be endangered by room confinement according to the policies or practices of YRTC-Geneva. Filing 145 at 6. Defendants point out that Spiegel likewise never had any concerns that room confinement was used improperly at YRTC-Geneva. Filing 145 at 6. Defendants also argue that the record does not demonstrate that Defendants consciously disregarded a known risk of harm. Filing 145 at 7.

  b. Plaintiffs Have Failed to Generate a Factual Dispute that Defendants Were Deliberately Indifferent to or Tacitly Authorized Unconstitutional Use of Room Confinement

Plaintiffs have not pointed to any evidence that any Defendant had any direct participation in an alleged constitutional violation of any Plaintiff's rights relating to the use of room confinement at YRTC-Geneva. Consequently, each Defendant is entitled to qualified immunity "unless [Plaintiffs] prove[ ] that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Davis*, 11 F.4th at 624 (quoting *Krigbaum*, 808 F.3d at 340). Plaintiffs have not generated genuine issues of material fact on either requirement. *See Jones*, 77 F.4th at 662–63 (explaining that the

26

party resisting summary judgment must come forward with specific facts showing there is a genuine issue for trial).

First, Plaintiffs have pointed to no evidence that any Defendant received notice of a pattern of unconstitutional use of room confinement by subordinates. *Id.* Contrary to Plaintiffs' argument, there is no evidence that any Defendant knew that Plaintiffs were being subjected to unconstitutional solitary confinement and at a substantial risk of harm in violation of their due process rights yet failed to stop the practice. Filing 145 at 20. At most, the record shows that Smith was involved in almost daily review of the use of room confinement but was not made aware that it was used unconstitutionally as to any of the youths at YRTC-Geneva, let alone any Plaintiff. Plaintiffs assert instead that a review of facility video footage, daily logbooks, and room confinement reports showed instances where youths in confinement did not have an appropriate place to sleep, rooms with working light fixtures, access to programming including educational services, physical exercise, and appropriate mental health services. Filing 144 at 5 (¶ 53); Filing 144 at 12 (¶ 213). However, as Defendants point out, "the alleged facility video footage, daily logbooks, submitted juvenile room confinement reports and interviews are not part of the summary judgment record." Filing 150 at 13 (¶ 213). Moreover, Plaintiffs do not state that these sources specifically indicate any information about room confinement of any specific Plaintiff. On the other hand, evidence in the record cited by Defendants, consisting of YRTC-Geneva confinement records for Plaintiffs and related documentation, shows that Plaintiffs' confinements complied with YRTC-Geneva policies. Filing 134 at 16–18 (¶¶ 110–112, 114–120) (records of D.S.'s room confinements and her testimony about them), 18–22 (¶¶ 123–128, 135) (records of M.D.'s room confinements), 23–25 (¶¶ 143, 149–153) (records of A.W.'s room confinements and her testimony

about them); 27–32 (¶¶ 170–172) (records of A.S.W.'s room confinements and her testimony about them).

Second, Plaintiffs have pointed to no evidence that any Defendant was deliberately indifferent to or authorized any unconstitutional room confinement. *Davis*, 11 F.4th at 624. Smith was not aware of any allegations of "physical neglect" of a youth by a YRTC-Geneva staff member, Filing 134 at 12 (¶ 76), so she could not be deliberately indifferent to it. Plaintiffs allege that "Smith was made aware that 'room confinement' was being used for youth[s] at YRTC-Geneva." Filing 134 at 12 (¶ 76); Filing 144 at 8 (¶ 76). However, Plaintiffs' further allegation that "room confinement" was a form of "physical neglect" is a legal conclusion insufficient to defeat summary judgment. *See Jones*, 77 F.4th at 663 (explaining that the nonmoving party's own conclusions are insufficient to withstand summary judgment). The parties do not dispute that in addition to the cadence calls, Spiegel had multiple calls with Smith on a daily basis to discuss the use of room confinement, who was in room confinement, how long the youths had been in room confinement, and what the youths needed to do to get out of room confinement. Filing 134 at 13 (¶ 84). Plaintiffs' allegation that Smith "had concerns" about the use of room confinement at YRTC-Geneva is a mischaracterization. Filing 144 at 6–7 (¶ 60); Filing 150 at 29 (¶ 258). Smith testified that her "concerns" were, "I wanted to just make sure that girls were appropriately being supervised and cared for, that the surroundings were good," and that to her knowledge the youths were taken out to get meals and do activities. Filing 150 at 29 (¶ 258) (citing Filing 133-6 at 331). This testimony provides no inference to a reasonable factfinder that Smith had concerns based on knowledge of any actual misuse of room confinement. *See Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable factfinder standard for summary judgment). Likewise, there is no evidence that Spiegel or Smith knew of and were deliberately indifferent to or tacitly approved any

unconstitutional room confinement. Plaintiffs point to their testimony about improper use of room confinement, Filing 144 at 6–7 (¶ 60); Filing 150 at 29 (¶ 258), but Plaintiffs have cited no evidence reasonably suggesting that any Defendant knew about Plaintiffs' allegations of improper use of room confinement at the time such confinement occurred. *Liberty Ins. Corp.*, 87 F.4th at 888. Defendants could not be deliberately indifferent to or tacitly authorize unconstitutional conduct they knew nothing about. *See Davis*, 11 F.4th at 624 ("Notice is the touchstone of deliberate indifference in the context of § 1983 [supervisory] liability." (quoting *Atkinson*, 709 F.3d at 1216)). Even viewing Plaintiffs' allegations in the most favorable light possible, *see Liberty Ins. Corp.*, 87 F.4th at 888 (requiring such consideration of the nonmovant's allegations), those allegations suggest no more than negligence in failing to detect and prevent a subordinate's conduct, which is not enough for liability under § 1983. *Davis*, 11 F.4th at 625.

Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim of allegedly unconstitutional room confinement on the basis of qualified immunity.

### 2.    *The Failure to Restaff Claim*

The next part of Plaintiffs' Fourteenth Amendment claim is that Defendants failed to restaff the facility adequately. Filing 145 at 2. Defendants argue that they are entitled to qualified immunity from this part of Plaintiffs' Fourteenth Amendment claim.

#### a.    The Parties' Arguments

Defendants contend that allegations that Defendants failed to restaff YRTC-Geneva adequately are without merit. Filing 135 at 12. Instead, they point to Smith's efforts with NDHHS human resources and administration to encourage people to be employed at YRTC-Geneva and her efforts to bring staff members from other YRTC facilities to support YRTC-Geneva's operations and fill staff shortages and vacancies. Filing 135 at 12. They also point out that Smith hired both Dr. James Sorrell, a psychiatrist, to look at treatment planning, and Dr. Janine Fromm,

also a psychiatrist, as executive medical director for all behavioral health programs at YRTC-Geneva. Filing 135 at 12–13. Defendants argue that Scarborough also worked to fill staffing vacancies and that Spiegel worked with administration at other YRTC centers to help assist YRTC-Geneva. Filing 135 at 13.

Plaintiffs respond that when the therapist left the staff at YRTC-Geneva in 2018, the role was not filled with a replacement, which left no mental health professional for the youths. Filing 145 at 16. Plaintiffs argue that the use of the clinical psychologist at YRTC-Kearney to help cover responsibilities at YRTC-Geneva meant that he did not have enough time to spend at YRTC-Geneva. Filing 145 at 17. They also argue that it is undisputed that in the final months that YRTC-Geneva was open, the facility was severely understaffed and what staff was on-site was overworked, which compromised the staff's ability to supervise and care for the youths. Filing 145 at 17. Plaintiffs contend further that Smith did not restaff the facility; that Scarborough was aware that the facility was understaffed, including that it lacked mental health professionals and needed more counselors; and that Spiegel was aware that there was not adequate staff in key positions, including a facility operating officer. Filing 145 at 26–27.

In reply, Defendants reiterate that they worked hard to keep YRTC-Geneva fully staffed by pursuing a variety of efforts to attract staff. Filing 149 at 8. They also reiterate that to address staffing shortages or vacancies, they brought in staff members from other YRTC facilities to ensure good coverage for the youths. Filing 149 at 8.

### b. Plaintiffs Have Failed to Generate a Factual Dispute that Defendants Were Deliberately Indifferent to Staffing Problems

There is no dispute that Defendants were all aware of staffing problems and shortages, including the resignation of the full-time psychologist in 2018, Filing 150 at 3–4 (¶¶ 191–192), the loss of the facilities operating officer, Filing 150 at 8 (¶ 200), and the lack of sufficient counselors,

30

Filing 150 at 25 (¶ 245). Nevertheless, Plaintiffs have not generated a genuine issue of material fact that Defendants were deliberately indifferent to or authorized the staff shortages. *Davis*, 11 F.4th at 624. Instead, no reasonable jury could conclude that Defendants were criminally reckless in their efforts to acquire adequate staff. *See S.M.*, 874 F.3d at 585 (stating the deliberate indifference standard as equal to the criminal law definition of recklessness); *see also Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable jury standard for summary judgment).

Specifically, as Defendants assert, the record shows that Nash was temporarily replaced with a Kearney psychiatrist. Filing 150 at 4 (¶ 192). In June 2019, in her role as CEO of NDHHS, Smith brought Dr. James Sorrell, a psychiatrist, into YRTC-Geneva to look at treatment planning and medication management to make sure that treatment for the youths was happening and to make sure that the medications were applicable to how the youths were receiving treatment. Filing 134 at 5 (¶ 24). Smith believes that Dr. Sorrell looked at the treatment plans for every youth at YRTC-Geneva. Filing 134 at 5 (¶ 25). Dr. Sorrell began treatment team meetings with the YRTC-Geneva staff so that the staff was aware of the clinical needs of the youths. Filing 134 at 6 (¶ 27). In June 2019, Smith hired Dr. Janine Fromm, a psychiatrist, as executive medical director, and Dr. Fromm oversaw all behavioral health programs. Filing 134 at 6 (¶ 28). Smith was also in conversations with Boys Town to provide telemedicine for the youths at YRTC-Geneva. Filing 134 at 6 (¶ 29). To try to recruit staff for YRTC-Geneva, Scarborough, Smith, and NDHHS human resources and administration would post flyers, host job fairs, go into the community to encourage people to be employed at YRTC-Geneva, rely on word of mouth, and have discussions with local colleges to see if NDHHS could recruit staff for YRTC-Geneva. Filing 134 at 6 (¶ 32). In addition, to address the staffing shortages or vacancies at YRTC-Geneva, the Defendants would bring in staff members from other YRTC facilities, such as YRTC-Kearney, YRTC-Whitehall, and YRTC-Hastings, to

support YRTC-Geneva's operations and to fill such shortages or vacancies. Filing 134 at 6 (¶ 33);
Filing 134 at 7 (¶ 35).

Even accepting Plaintiffs' allegations that the loss of specific people integral to the YRTC-Geneva program, the requirement that several key positions oversee more than one facility, and the unfilled positions vital to the functioning of YRTC-Geneva resulted in a weakening of the YRTC-Geneva facilities management and compromised the ability of staff to care for and supervise the youths, Filing 150 at 5–6 (¶¶ 196–197), those facts do not demonstrate deliberate indifference. In the light most favorable to Plaintiffs, those facts show only the ultimate failure of Defendants' efforts to keep YRTC-Geneva adequately staffed. Finally, Smith recognized the problem with staffing and made the decision to close YRTC-Geneva in part because she did not have enough staff. Filing 150 at 17 (¶ 221). No reasonable jury could conclude that recognizing the staffing problem was such that the facility should close and that the youths should be transferred to another facility was a criminally reckless response to staffing problems. *See S.M.*, 874 F.3d at 585 (stating the deliberate indifference standard as equal to the criminal law definition of recklessness); *see also Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable jury standard for summary judgment).

Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim of alleged failure to restaff YRTC-Geneva on the basis of qualified immunity.

### 3.    The Failure to Implement Programing Claim

The last part of Plaintiffs' Fourteenth Amendment claim is premised on alleged failure to implement rehabilitation and treatment programs at YRTC-Geneva. Filing 145 at 2. Defendants also seek summary judgment on this part of Plaintiffs' Fourteenth Amendment claim on the basis of qualified immunity.

32

a.  The Parties' Arguments

Defendants argue that Plaintiffs were provided with programming, schooling, therapy, counseling, and other medical care if needed. Filing 135 at 16. They point out that after the licensed psychologist resigned in 2018, Smith hired Dr. Janine Fromm, a psychiatrist, in 2019 as executive medical director, and Dr. Fromm oversaw all behavioral health programs. Filing 134 at 6 (¶ 28). Defendants also point to evidence that M.D. participated in group therapy, received treatment, and met with a counselor and therapist; that A.W. attended school in the mornings and programming most afternoons; and that A.S.W. participated in programming including recreation, basketball, swimming, baseball, and golfing. Filing 135 at 14.

In contrast, Plaintiffs argue that Defendants failed to provide or implement rehabilitative or education programming and mental health services while Plaintiffs were at YRTC-Geneva. Filing 145 at 15. They assert that after the staff therapist left, the role was not filled with a replacement, and instead of programming, the youths would just sit around and do nothing, until problems arose due to boredom causing the youths to act out. Filing 145 at 16. Furthermore, Plaintiffs argue that Speigel eliminated the "levels" program with no intervention or program to replace it, which left the youths with no behavior modification plan, and nothing to work toward, so they just started destroying everything. Filing 145 at 17. Plaintiffs argue that all Defendants were aware of the deterioration of programming and that it led to the closure of YRTC-Geneva. Filing 145 at 26–27.

b.  Plaintiffs Have Failed to Generate a Factual Dispute that Defendants Were Deliberately Indifferent to the Lack of Programming

There is no dispute that Defendants were aware of difficulties with programming and had difficulties maintaining staffing at a level to facilitate programming after the resignation of the full-time psychologist in 2018. Filing 150 at 3–4 (¶¶ 191–192). Nevertheless, Plaintiffs have not

generated a genuine issue of material fact that Defendants were deliberately indifferent to or authorized the lack of programming. *Davis*, 11 F.4th at 624. Instead, no reasonable jury could conclude that Defendants were criminally reckless in their efforts to maintain programming. *See S.M.*, 874 F.3d at 585 (stating the deliberate indifference standard as equal to the criminal law definition of recklessness); *see also Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable jury standard for summary judgment).

Specifically, in June 2019, Smith hired Dr. Janine Fromm, a psychiatrist, as executive medical director, and Dr. Fromm oversaw all behavioral health programs. Filing 134 at 6 (¶ 28). It is undisputed that YRTC-Geneva offered a variety of programming to the youths there, including an educational program that was accredited by the Nebraska Department of Education and AdvancED, and programming relating to vocational needs, cosmetology, family consumer sciences, parenting, independent living, religion, and various recreational activities. Filing 134 at 15 (¶ 103). Although there are reasonable inferences that the programming suffered from staffing problems, the Court concluded above that no reasonable jury could find that Defendants were deliberately indifferent to the need to improve staffing. Defendants also point to evidence that M.D. participated in group therapy, received treatment, and met with a counselor and therapist, while Plaintiffs dispute this fact only on the ground that M.D. did not have such programming consistently during the entire time she was at YRTC-Geneva. Filing 134 at 19 (¶ 129); Filing 144 at 13 (¶ 129). It is undisputed that A.W. attended school in the mornings and programming most afternoons and also participated in sports. Filing 134 at 23 (¶ 146). It is also undisputed that A.S.W. participated in programming including recreation, basketball, swimming, baseball, and golfing, and that she was able to participate in all the programming that she wanted while at YRTC-Geneva. Filing 134 at 26 (¶¶ 160–161). As to Spiegel's termination of the "levels" program purportedly

without a replacement program, he did so because he believed that program was being manipulated and that YRTC-Geneva continued to offer a variety of programming and treatment. Filing 150 at 10–11 (¶ 207). No reasonable jury could conclude that his decision was so unreasonable as to be criminally reckless, as required to establish deliberate indifference and deprive him or any other Defendants of qualified immunity. *See S.M.*, 874 F.3d at 585 (stating the deliberate indifference standard as equal to the criminal law definition of recklessness); *see also Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable jury standard for summary judgment). Finally, Smith recognized the problem with programming and made the decision to close YRTC-Geneva in part because she did not have enough staff or programming. Filing 150 at 17 (¶ 221). No reasonable jury could conclude that recognizing the programming problem was such that the facility should close and that the youths should be transferred to another facility was a criminally reckless response to programming problems. *See S.M.*, 874 F.3d at 585 (stating the deliberate indifference standard as equal to the criminal law definition of recklessness); *see also Liberty Ins. Corp.*, 87 F.4th at 888 (stating the reasonable jury standard for summary judgment).

Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim of alleged failure to provide programming on the basis of qualified immunity.

### III. CONCLUSION

Plaintiffs do not contest summary judgment in favor of Defendants on Plaintiff's Eighth Amendment claims. The Court's conclusion that Defendants have qualified immunity to Plaintiffs' Fourteenth Amendment claim makes it unnecessary for the Court to consider any other arguments concerning summary judgment on the Fourteenth Amendment claim. Accordingly, upon the foregoing,

IT IS ORDERED that Defendants' Motion for Summary Judgment, Filing 129, is granted as to all Plaintiffs' claims. The jury trial in this matter scheduled to begin on June 16, 2025, is canceled. Judgment shall enter accordingly.

Dated this 11th day of April, 2025.

BY THE COURT:

Brian C. Buescher
United States District Judge